

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 20, 2021

**BY ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Jose Morely Chocron*, 20 Cr. 400 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in connection with the sentencing of Jose Morely Chocron (the "defendant") in the above-captioned matter, currently scheduled for August 27, 2021 at 5:00 p.m. For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines range of 37 to 46 months is appropriate in this case.

      **I.**    **Offense Conduct**

      The defendant is one of a network of individuals who participated in a scheme to launder what they believed to be criminal proceeds by various methods. He was first identified to law enforcement by a confidential source ("CS-1") in or around January 2019. Beginning in May 2019, CS-1, another confidential source ("CS-2"), and two undercover agents ("UC-1" and "UC-2") provided Chocron and his associates – Isaac Schachtel, Juan Marcos Matos Ruiz, Juan Carlos Balaguera Villamizar, and Alfredo Lichoa – with more than $1.5 million in funds that they represented were the proceeds of bribe payments to Brazilian public officials, and which the defendants agreed to launder. *See* Pre-sentence Investigation Report ("PSR") ¶¶ 16-38.

      Chocron himself was responsible for the laundering of more than half a million dollars, arranging for the purported criminal proceeds to be received in cash from the confidential sources and undercover agents and transferred to undercover FBI bank accounts – at least one of which was located in the Southern District of New York – via international and domestic bank accounts. Chocron was well-positioned undertake the laundering of this quantity of funds: He controlled a preexisting unlicensed international money transmitting business, which he leveraged in order to absorb and remit the money he was provided by the FBI. Chocron explained this to CS-1 and CS-2 when he met with them on May 10, 2019 in order to discuss a laundering the proceeds of bribe payments that had been made to Brazilian public officials. During that meeting, which was recorded, the following conversation occurred, in part:[1]

---

[1] Conversations among Chocron, CS-1, and CS-2 were conducted largely in Spanish.

| | |
|---|---|
| **CS-2:** | …[Y]ou told me, for example, that sometimes you could put someone's money in a … at 15%. I also have an infrastructure. I have here a very good Brazilian organization. |
| **CHOCRON:** | Uh huh. |
| **CS-2:** | And we have companies here and we have bank accounts here that can deal with big money, to move big amounts. What I do is, for example, I pick up money from-- |
| **CHOCRON:** | [overlapping] From people, from the ones you explained to me. |
| **CS-2:** | -- from the Brazilian politicians. |
| **CHOCRON:** | [overlapping] who don't know where to keep their money. |
| **CS-2:** | They have all of it, all of it! But astronomical amounts, that one would say-- |

\*   \*   \*

| | |
|---|---|
| **CS-2:** | So the man comes… they travel with diplomats, arrive here and they handle a million here, or there is a million there or $500,000 or $300,000-- |
| **CHOCRON:** | [overlapping] Yes, whatever. |
| **CS-2:** | Whatever. So, I take my time to make a deposit in the bank, because I have money in the bank, so what I do is that when he gives me one million I take out my commission, and I transfer his money which gets there within a day or two. . . . |

\*   \*   \*

| | |
|---|---|
| **CHOCRON:** | I'm interested, because [U/I]. What's my business about? My business is that I have Jewish people here that need cash. They will transfer to you, because they don't want to pay taxes, so they will transfer to you. What do I do? I give them the money and they make a transfer to me. |
| **CS-2:** | Ah! So, for example, I give you the account here and you transfer it to me into the same account? |
| **CHOCRON:** | But you need to give me cash. |

\*   \*   \*

| | |
|---|---|
| **CHOCRON:** | . . . [W]hat's the percentage that's left for us? |

2

| | |
|---|---|
| **CS-2:** | --this groups is only us.  Look, I charge them 10%. . . |
| **CHOCRON:** | No, that does not work. |
| **CS-2:** | Is it too low? |
| **CHOCRON:** | Sure! Listen to me, [CS-2], I…I mean, he knows I know Salomon del Valle and-- |
| **CS-1:** | [overlapping] Yes, everything. |
| **CS-2:** | I don't charge them over 10 [percent]. |
| **CHOCRON:** | You can't.  No, you can charge him more than 10.  Are you crazy, that that has and international rate table. |
| **CS-2:** | But it's very high. |
| **CHOCRON:** | That's like gold.  That has an international rate. |
| **CS-2:** | I have never worked with more than the 10.  I have done-I have done deals at 5. |
| **CHOCRON:** | [overlapping]  Tell him-tell him he is crazy. You mean, you handle his cash and you send him 5%? He takes 5%? You are crazy! You don't know the risk you are taking! |
| **CS-2:** | Look, I pick up 1 million from the man, and he'll have the money in the bank two days later. |
| **CHOCRON:** | Ah, well, I will not be sending it to you in two days. I won't send you… |
| **CS-2:** | [overlapping] I, I… |
| **CHOCRON:** | I tell you the truth, I will not send it to you in two days. |
| **CS-2:** | How much would we take? |
| **CHOCRON:** | From one week to 15 days. |
| **CS-2:** | Okay. |
| **CHOCRON:** | I can't do it in two days! It doesn't work like that. Ah, it's not a problem if we are dealing with 100,000.00-200,000.00, but if we are dealing with a large amount, you'll have to wait. |
| **CS-1:** | Sure. |

| | |
|---|---|
| **CS-2:** | Large amounts would be anything over one million? |
| **CHOCRON:** | From one million and up…or 500 and up. |
| **CS-2:** | Okay. Fine. |
| **CHOCRON:** | But 10% is very low, [CS-2]. |
| **CS-2:** | Is it very low? |
| **CHOCRON:** | It's very low. You know what laundering money entails? That shit--- |
| **CS-2:** | It's true. |
| **CHOCRON:** | Let's be clear, that's laundering money. |
| **CS-1:** | [overlapping] Of course. |
| **CS-2:** | They – they are corrupt people. They are politicians. |
| **CHOCRON:** | Yes, but then they wouldn't mind… they should not mind to pay 15%, which is the going rate. That's how much it cost, [CS-2]. |
| **CS-2:** | Okay. |
| **CHOCRON:** | If not, don't do it. |

\*   \*   \*

| | |
|---|---|
| **CS-2:** | So the lowest we can work that is at 15? |
| **CHOCRON:** | Yes, that's the minimum. |
| **CS-2:** | Okay. |
| **CHOCRON:** | There are lots of people, and you know it… listen to me, and you know, they know-they know… the person who launders money knows the rate is 15%. |
| **CS-2:** | They know that if you lose it, you pay it. |
| **CHOCRON:** | What happens is that because you didn't know about that, you charged him 10% because you felt like it. |
| **CS-2:** | No, because they have been real cool, and I've been giving it to them very cheap for many years. |

4

| | |
|---|---|
| **CHOCRON:** | That's fine, but that's not like that. That's not right. How can a Brazilian come and give you cash to put in his account all cleaned, without any— uh, at 10%?! No way. That doesn't exist. |
| **CS-1:** | Hell no. |
| **CHOCRON:** | We are the one risking it. |
| **CS-1:** | He is the one risking his ass! |
| **CHOCRON:** | No, no, we are! |

In the conversation detailed above, in addition to explaining his preexisting money transmitting business, Chocron demonstrated his prior knowledge of the way in which money laundering transactions are conducted and his understanding of the proposed scheme.

      Chocron reiterated this in subsequent conversation with CS-1 and CS-2. On May 13, 2019, the three met, so that CS-1 and CS-2 could deliver $15,000 in cash to Chocron, as a test of his ability to launder funds.[2] When CS-1 and CS-2 delivered the money, the following conversation occurred, in part:

| | |
|---|---|
| **CHOCRON:** | How much is there? |
| **CS-2:** | 15. |
| **CS-1:** | Perfect. |
| **CS-2:** | Look, wait, I brought it to you in 100… 50- dollar bills, some 20s, and a few small ones in case you need…because when one travels one needs small bills… I brought you about 1,000 dollars in tens. |
| **CS-1:** | And the coordinates are in there. |
| **CHOCRON:** | Okay. |
| | \*   \*   \* |
| **CS-2:** | Look, I put there for you. . . did you put the small piece of paper in there? |
| **CS-1:** | Yes. |

---

[2] The purpose of the transaction – to launder funds – is obvious from the conversation among Chocron, CS-1, and CS-2, both prior to the delivery of the funds and on the day of. The defendant's attempt to suggest that this transaction was a "loan" is revisionist at best.

5

| | |
|---|---|
| **CS-2:** | I'm giving you an account of a food company. I do not make food, but it comes up as "food products". And there is where you can put the money . . . that account can take a lot in. I just want for us to start this business. |
| **CHOCRON:** | No, what I want is for you to talk to these people. |
| **CS-2:** | I already spoke to the Brazilians and I raised it to twelve. . . |
| **CHOCRON:** | Remember something -- |
| **CS-2:** | … 15. Let's close them at 15. |
| **CHOCRON:** | [overlapping] Remember this, [CS-2], the business . . . this business of. . . |
| **CS-2:** | [overlapping] We are doing a huge favor for them… |
| **CHOCRON:** | . . . sending transfers, we have to do it very carefully because we need, for instance, a person like [CS-1] and another person that I have, which are the people that will take care of delivering the cash. |

\* \* \*

| | |
|---|---|
| **CS-2:** | But you can't stretch yourself either. |
| **CHOCRON:** | No, no, those are people who have been here for 30 years. They are very big people, people with money. What happens is that they have ranches. They have businesses and they pay a lot of taxes. So they don't pay taxes with the cash. |
| **CS-1:** | Sure. |
| **CS-2:** | That took them about 30-40 years to create that structure. |
| **CHOCRON:** | No, they do it when they have a person they trust. They don't do it with just anybody. |

\* \* \*

| | |
|---|---|
| **CHOCRON:** | There is something else…this is something I want to tell you that is very important: The same way you have experience, I have a lot of experience as I've acquired it with Salomon. Listen to me carefully, the money should generally be in higher denomination… because if they are going to send it to you in 20s, that's worth nothing. One can't do business in 20 dollar bills.[3] |

---

[3] Later in the conversation, Chocron stated that for $20 bills, they should charge a 20% commission, and for bills larger than $50, the commission should be 15%.

| | |
|---|---|
| CS-2: | I receive a lot of 20 dollar bills. |

Approximately one week later, $14,899.50 was transferred to a bank account controlled by the FBI, via three different bank accounts, including a bank account Chocron's name.

One month later, on June 18, 2019, CS-1 and CS-2 contacted Chocron to make arrangements to deliver an additional $50,000 in cash. Chocron was not in the United States at the time and instead instructed CS-1 and CS-2 to deliver the cash in two portions to two different couriers. When CS-1 and CS-2 met with one of those couriers at a shopping mall, she commented that she was not afraid or nervous because she picked up cash all the time. Within the next 10 days, a portion of the $50,000 was wired, via five different bank accounts,[4] to a bank account controlled by the FBI.[5]

On August 13, 2019, CS-1 and CS-2 introduced to Chocron an undercover FBI agent ("UC-1"), who was posing as a more sophisticated money launder than CS-1 or CS-2, who was interested in laundering large amounts of funds received as bribe payments by corrupt Brazilian politicians. During this meeting, the following conversation occurred, in part:

| | |
|---|---|
| UC-1: | So, so you can understand the perspective somehow, it's, since, since politics has changed in Brazil with the new president . . . |
| CHOCRON: | Uh-huh. |
| UC-1: | . . . people— the same way as in Venezuela where many people are desperate with the political situation there. They want to take everything they have out of Venezuela, right? |
| CHOCRON: | They had offered it to me but the thing is that I don't do business with people from Venezuela. |
| UC-1: | Oh, okay. |
| CHOCRON: | But they had offered me Euros. |
| UC-1: | Uh-huh. |
| CHOCRON: | They exchange it to me, giving me 10 percent, plus getting paid even exchange rate Euros to Dollars, but I told them no. It's because I don't do business with, with assassins. I do business with delinquents but not with assassins. Do you understand me now? |
| UC-1: | Oh, yes, yes, yes. Well, if you consider the Brazilian politicians only delinquents, then we are good. [Laughs] |

---

[4] Certain of these bank accounts were controlled by Juan Marcos Matos Ruiz.

[5] The total amount returned was short the agreed upon amount by approximately $6,000.

| | |
|---|---|
| **CHOCRON:** | I consider them only delinquents. |

* * *

| | |
|---|---|
| **CHOCRON:** | We are understanding each other better now. |
| **UC-1:** | Uh, yes, because the thing is, imagine. . . I have big amounts in cash. |
| **CHOCRON:** | Yes, but we're going to go slowly. |
| **UC-1:** | [overlapping] You know—you know how much the base 'tip' for a politician in Brazil would go for? |
| **CHOCRON:** | No. |
| **UC-1:** | The, the minimal 'tip' towards a soccer stadium project starts at one million dollars, not less than that, and that's only one person, one politician, a *prefeito*, uh, how do you say? A major, a governor. |
| **CHOCRON:** | [overlapping] Listen, this one here, the one I'm calling now. . . |
| **UC-1:** | [laughs] |
| **CHOCRON:** | . . . he has at least 1 billion dollars; this one, the one I'm calling now. |

At the conclusion of the meeting, UC-1 provided Chocron with $250,000 in cash and they agreed upon a 15% commission. A portion of those funds was eventually wired, via six different bank accounts, to two bank accounts controlled by the FBI.[6]

In early October 2019, UC-1 and Chocron arranged for Chocron to launder an additional $250,000.[7] Chocron informed UC-1 that he would be sending an intermediary to pick up the cash, and on October 10, 2019, at the direction of Chocron, UC-1 delivered $250,000 to Juan Carlos Balaguera Villamizar. These funds, minus an 18% commission, were returned to several bank accounts controlled by the FBI, via four different bank accounts.

## II.    Procedural History

The defendant was charged by complaint on February 27, 2020 and arrested on March 11, 2020 after failing to board a connecting flight to Miami that was scheduled to arrive on March 9, 2020 (the day that several of his co-defendants were arrested). On or about August 6, 2020, the defendant was indicted in a one-count indictment with conspiracy to commit money laundering, in violation of Title 18, United State Code, Section 1956(h) (the "Indictment"). On March 16,

---

[6] The total amount returned was short the agreed upon amount by approximately $7,000.

[7] During discussions regarding this transaction, the UC reminded Chocron, that Chocron still owed approximately $13,000 from previous transactions.

2021, the defendant pled guilty to the Indictment pursuant to a plea agreement (the "Plea Agreement"), in which the parties calculated the defendant's Criminal History Category as I, and the applicable Guidelines offense level as 21, resulting in a Guidelines range of 37 to 46 months' imprisonment.

In the PSR, finalized on June 2, 2021, the Probation Office ("Probation") conducted the same Guidelines calculation and also concluded that the applicable Guidelines range was 37 to 46 months' imprisonment. PSR at 27. Probation recommended a sentence of 18 months' imprisonment followed by one year of supervised release. *Id.*

### III. Discussion

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In this case, a sentence within the Guidelines range is necessary to reflect appropriately the nature and seriousness of the defendant's conduct, to promote respect for the law, and to afford adequate deterrence to those similarly situated to the defendant.

The defendant, in order to make money, facilitated the laundering of $565,000 in cash that had been represented to him to be the proceeds of bribe payments that had been made to Brazilian public officials. While the defendant attempts to paint his offense as an act of desperation, *see*

9

PSR ¶¶ 48-50, the defendant engaged in these transactions on several occasions over the course of months. The defendant himself personally accepted a total $265,000 in cash, over two transactions, and directed that the rest of the funds be distributed to various couriers and associates, who would arrange for the funds to be moved at his direction. The defendant then coordinated cleaning of that cash, by arranging for the funds – minus a commission – to be transferred back to bank accounts that he believed were controlled by other money launderers, but which were in fact controlled by the FBI, in order to make the influx of funds appear to have come from a legitimate source.

While the funds in question ultimately were not actually criminal proceeds, the defendant was both eager to accept them and prepared to do so, by virtue of his operation of an unlicensed money transmission business that was able to receive and digest large volumes of cash and remit it drawing on a network of accounts through which to transfer the funds. Such conduct is serious and warrants a sentence within the Guidelines range.

### IV. Judicial Order of Removal

On July 22, 2021, the Government provided notice to the defendant that, in light of his guilty plea, it intended to request that the Court issue a Judicial Order of Removal pursuant to Section 238(c) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1228(c). On August 17, 2021, the defendant executed a Plea Statement in Support of Judicial Removal. The Government's notice, defendant's statement, and the concurrence of United States Immigration and Customs Enforcement are attached as Exhibit A. The Government now requests that the Court enter an Order of Judicial Removal, attached as Exhibit B.

### V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By: _/s/_
Benet J. Kearney / Andrew C. Adams / Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2260 / 2340 / 2520

cc: Howard Brownstein (by email and ECF)
    Probation Officer Michelle Millan (by email)